**GOVERNMENT OF THE VIRGIN ISLANDS, Appellee**

**v.**

**ROBERT PINNEY, Appellant**

No. 91-3425

United States Court of Appeals
for the Third Circuit

June 22, 1992

THURSTON T. MCKELVIN, Federal Public Defender; AUGUSTIN AYALA (Argued), Assistant Federal Public Defender, St. Thomas, V.I., *for appellant*

TERRY M. HALPERN, United States Attorney; AUDREY THOMAS–FRANCIS (Argued), Assistant United States Attorney, Charlotte Amalie, V.I., *for appellee*

BEFORE: STAPLETON, HUTCHINSON and NYGAARD, *Circuit Judges*

## OPINION OF THE COURT

STAPLETON, *Circuit Judge*

Robert Pinney appeals his conviction for aggravated rape in violation of V.I. Code Ann. tit. 14, § 1700(a)(1) (Supp. 1990).[1] The district court had jurisdiction over this case under 48 U.S.C. § 1612 and V.I. Code Ann. tit. 4, § 32. We have jurisdiction over Pinney's appeal pursuant to 28 U.S.C. § 1291. We will reverse and remand for a new trial.

### I.

At trial, the alleged victim, Tamisha Colaire, testified that when she was seven years old, she visited Pinney's apartment to pick up her nephew whom Pinney had been babysitting. After escorting her nephew home, she returned to Pinney's apartment to retrieve a

---

[1] Section 1700(a)(1) provides that "[w]hoever perpetrates an act of sexual intercourse or sodomy with a person not the perpetrator's spouse who is under thirteen years of age . . . is guilty of aggravated rape."

bag which contained her nephew's belongings. According to Tamisha, Pinney raped her in his apartment and then warned her "not to tell anyone" or she would "get in trouble." App. 31. Pinney, who was 18 at the time of the alleged offense, testified that Tamisha had been to his apartment on the day in question but that there had been no assault.

Prior to the trial, the government filed a motion in limine requesting that it be allowed to introduce the testimony of Tamisha's sister, Jamila. Jamila, who was thirteen at the time of the trial, alleged that Pinney had raped her when she was six years old. The court reserved ruling on the government's motion, pending developments at trial.

During the defense counsel's cross examination of Tamisha, the following exchange took place:

Q: Did there come a time when [Assistant U.S.] Attorney Francis spoke to you . . . ?

A: Yes.

Q: What did she discuss with you?

A: Nothing much. She was just asking me how much time did I get molested?

Q: What did you tell her?

A: I told her I got molested. I told her I got molested more than once.

Q: More than once?

A: Uh-huh.

Q: Who molested you?

A: Robert [Pinney].

Q: Isn't it true, Tamisha, that you told the police that he only molested you once?

A: Could you repeat that?

Q: Did you tell the police that Robert molested you once?

A: Yes.

Q: And you are saying now that he molested you more than once?

A: Yes, when I was small. I didn't remember that.

App. 36-39.

After Tamisha left the witness stand, the trial judge discussed with counsel the testimony elicited by Pinney's attorney, Mr. Ayala, from Tamisha.

415

THE COURT: If I understand correctly during the course of examination of the alleged victim, Mr. Ayala, you brought up the question of whether any incident like this had occurred earlier.

MR. AYALA: That is correct, Your Honor.

THE COURT: And whether or not it had involved the defendant.

MR. AYALA: That is correct, Your honor.

App. 44-45.

The court subsequently agreed to let Jamila testify as a part of the government's case. It explained to defense counsel:

I understand the problems, that you have to deal with the case as you find it, but I'm afraid that you opened the door for the inference and for your possible argument that the alleged victim . . . has testified that she has experienced the alleged type of offense before and [did] not report[ ] it to anybody, and under the totality of the circumstances her testimony is not reliable.

\* \* \*

Now, if [the] older sister testifies that when she was . . . [s]ix years old, she had the same kind of occurrence and . . . that she was told the same thing by the defendant in terms of not telling anybody or else she would get into trouble[, then] [u]nder those circumstances, . . . the Court must permit the testimony or should permit—maybe "must" is a strong word—should exercise [its] judgment under the combination of [Federal Rules of Evidence] 403 and 404(b), to permit the [testimony] to come in.

App. 51-52; supp. app. 1.

Jamila subsequently testified at trial that she had been raped by Pinney when she was six years old. She also testified that the rape had occurred in the same apartment in which Pinney allegedly raped Tamisha and that Pinney told her not to tell anybody of the incident or he would beat her.

■ The jury found Pinney guilty of aggravated rape and the district court sentenced him to a 15-year prison term. On appeal, Pinney argues that the admission of Jamila's testimony violated Federal Rules of Evidence 403 and 404(b) and deprived him of a fair trial. We review the district court's decision for abuse of discretion. United States v. Driggs, 823 F.2d 52, 54 (3d Cir. 1987).

## II.

Federal Rule of Evidence 404(b) provides that

> [e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation plan, knowledge, identity, or absence of mistake or accident.

■■ Rule 404(b) prohibits the admission of evidence concerning prior criminal acts for the purpose of showing that a defendant has a propensity or disposition for criminal activity. Government of Virgin Islands v. Norris, 938 F.2d 401, 419 (3d Cir. 1991) (citations omitted). We have recognized, however, that other-crime evidence is admissible if offered for a proper purpose apart from showing that the defendant is a person of criminal character. Id. Such evidence is subject only to the limitations imposed by Federal Rules of Evidence 402 and 403. Id. (citing United States v. Scarfo, 850 F.2d 1015, 1019 (3d Cir.), cert. denied, 488 U.S. 910 (1988)).

Rule 402 provides that evidence "which is not relevant is not admissible." Rule 403 stipulates that "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."

■ In order, then, to admit evidence under Rule 404(b),

> a court must be able to articulate a way in which the tendered evidence logically tends to establish or refute a material fact in issue, and that chain of logic must include no link involving an inference that a bad person is disposed to do bad acts. Once the chain of logic has been articulated, its probative strength must be weighed under Rule 403 against any potential for unfair prejudice.

U.S. v. Echeverri, 854 F.2d 638, 644 (3d Cir. 1988).

## III.

■■ As the trial judge explained to the jury, on a charge of aggravated rape the government has the burden of proving beyond a reasonable doubt that: (1) the defendant intentionally had sexual intercourse with the alleged victim (defined as inserting "a hand, finger or object into [her] vagina, vulva or labia"), (2) the victim

was not his spouse, and (3) the victim was under the age of 13. Thus, neither the presence or absence of consent on the part of Tamisha nor Pinney's belief regarding such consent was at issue during the trial.

In charging the jury on the permissible use of Jamila's testimony, the trial judge gave the following limiting instructions:

> The defendant is not on trial for committing acts not alleged in the Information. The defendant is on trial on the single charge in the Information. Therefore, you may not consider the evidence of a similar act as a substitute for proof that the defendant committed the crime charged in the Information, nor may you consider such evidence of a similar act as proof that the defendant has a criminal personality or a bad character. If you determine that the defendant committed the act charged in the Information and, also, committed one or more similar acts as well, then you may, but you need not, draw an inference that in doing one or more of them, and in doing the act charged in the Information, the defendant acted knowingly and intentionally and not because of some mistake, accident or other innocent reason. So, too, if you find that the defendant did engage in such alleged conduct, and if you find that such other conduct has sufficiently similar characteristics to that charged in the information, you may, but you need not, infer . . . that the act charged in the Information and such other alleged, similar conduct, were part of a common plan or scheme permitted [sic] by the defendant. Evidence of similar acts may not be considered by you for any other purposes. Specifically, you may not use such evidence to conclude that because the defendant committed such other act, he must, also, have committed the act charged in the Information.

N. T. 145-47.

Thus, the court instructed the jury that it could consider the evidence concerning the alleged rape of Jamila six years before the alleged rape in this case *for two purposes only*: (1) in determining whether the defendant "acted knowingly and intentionally and not because of some mistake, accident or other innocent reason, and (2) in determining whether the alleged rape in this case and the earlier alleged rape were part of "a common plan or scheme" committed by the defendant. The court further admonished the jury that it could not use the testimony for the first purpose unless it first

found from other evidence that the defendant had had intercourse with Tamisha as well as Jamila. The court did not expressly instruct the jury on the significance of the possible existence of a common plan or scheme. Finally, the court warned the jury a second time not to use Jamila's testimony for any other purpose, and specifically not to infer from the evidence that Pinney was prone to this kind of criminal behavior and, therefore, must have raped Tamisha.

■ Since the government had the burden of proving that if Pinney had intercourse with Tamisha he did so intentionally and not by accident or mistake, the government was entitled to introduce evidence relevant to that element of the crime charged. If Pinney had intercourse with Tamisha, it is, to say the least, highly unlikely on the facts of this case that he did so by accident or mistake. Nevertheless, as a matter of logic, it is at least marginally more likely that he did so intentionally if he had previous experience with intercourse. Thus, there is a logical chain of inferences from Jamila's testimony to a relevant issue and no link in that chain involves an inference that because Pinney committed the first assault he was more likely to have committed the second as well. Accordingly, we conclude that to the extent that Jamila's testimony was offered to prove intentional action, it meets the relevance and proper purpose test.

We do not reach the same conclusion with respect to the second purpose for which the trial judge permitted the jury to use this evidence. While it is not altogether clear what the trial court had in mind when it referred to a "common plan or scheme," the government has been unable to articulate any theory that unites these isolated events which occurred six years apart, without resorting to the kind of character-based inference prohibited by Rule 404(b).

Ordinarily, when courts speak of "common plan or scheme," they are referring to a situation in which the charged and the uncharged crimes are parts of a single series of events. In this context, evidence that the defendant was involved in the uncharged crime may tend to show a motive for the charged crime and hence establish the commission of that crime, the identity of the actor, or his intention. Edward W. Cleary et al., McCormick on Evidence § 190, at 559 (3rd ed. 1984) [hereinafter McCormick]. Given the fact that the charged and uncharged crimes in this case are six years apart, the government does not, and cannot, advance this theory of ad-

missibility. See United States v. Fawbush, 900 F.2d 150, 151-52 (8th Cir. 1990); United States v. Davis, 657 F.2d 637, 639 (4th Cir. 1981).

The government advances two other theories of admissibility, only the first of which is arguably susceptible of characterization as "a common plan or scheme" theory. The government argues first that the similarities between the two alleged incidents were sufficiently similar to earmark them as the handiwork of the same actor, and thus Jamila's testimony constituted "signature evidence" and was admissible to establish the identity of Tamisha's assailant.[2] The government further contends that the challenged testimony was properly admitted to rehabilitate Tamisha's credibility after her cross-examination. Given the instructions of the trial court that the jury consider Jamila's story only to the extent it showed that Pinney's actions were intentional or part of a common scheme or plan, this second argument would not save the government's case even if we were to conclude that these suggested alternative purposes were proper. In any event, we cannot so conclude.

■■ A jury can rationally infer from evidence that the defendant committed a prior crime in an unusual and distinctive manner and evidence that a second similar crime was committed in the same unusual and distinctive manner that the defendant committed the second crime. This case, however, does not involve such signature evidence. The evidence concerning the manner in which the two alleged crimes were committed here was neither sufficiently detailed nor significantly unusual to permit any inference that the perpetrator of the second assault was the same perpetrator of the first. There are similarities between the two alleged incidents: each involved a minor of about the same age; each allegedly occurred in the defendant's apartment; each involved sexual intercourse; and each time, the defendant allegedly warned the victim not to tell anyone. But these shared characteristics are not sufficiently unique to warrant the inference that Pinney was the perpetrator in each incident. See McCormick § 190, at 559-60 ("Much more is demanded than the mere repeated commission of crimes of

---

[2] Weinstein views "signature crime evidence" as a subset of "common plan or scheme evidence." 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence, § 404[16], at 404-118-404-128. (1991). McCormick takes a contrary view. McCormick § 190, at 559-60. See also People v. Barbour, 436 N.E. 2d 667, 672 (Ill. App. Ct. 1982) (distinguishing common plan and scheme evidence from signature evidence).

the same class, such as repeated murders, robberies, or rapes. The pattern and characteristics must be so unusual and distinctive as to be like a signature.") (citations omitted).

 With respect to the government's contention that Jamila's testimony was admissible for rehabilitative purposes, we agree that the need to dispel an exculpatory implication implanted by the defense attorney during cross-examination of the prosecution's witnesses can fulfill the proper purpose requirement of Rule 404(b). See United States v. Cook, 538 F.2d 1000, 1003 n. 6, 1004 (3d Cir. 1976). See also United States v. Provenzano, 620 F.2d 985, 994 (3d Cir.) (other-crimes evidence admissible, in part, to counter doubts cast on government witnesses's credibility by defense counsel), cert. denied, 449 US. 899 (1980). In this case, however, there is no chain of logical inferences between a rape of Jamila by Pinney and Tamisha's credibility which does not involve an inference that if Pinney raped Jamila, he is likely to have raped Tamisha as well. While the government's contention is stated in terms of credibility, impeachment, and rehabilitation, it is in effect asking that Tamisha be believed when she says she was raped by Pinney because Pinney raped Jamila six years earlier. This type of inference is precisely the kind prohibited by Rule 404(b).[3]

## IV.

If the foregoing discussion seems highly theoretical, it is, of course, because there is no dispute in this case about the identity of the individual who was with Tamisha in Pinney's apartment on the afternoon in question or about whether any sexual intercourse that may have occurred at that time was accidental. The trial was about whether or not sexual intercourse occurred between Pinney and Tamisha. It was her word against his and if the jury believed her testimony that she was raped in Pinney's apartment, it is incon-

---

[3] We also reject the related argument that defense counsel "invited" Jamila's testimony during his cross-examination of Tamisha. The transcript shows that Tamisha volunteered the allegation of her prior molestation by Pinney and that counsel did not open the door to otherwise improper evidence regarding a prior rape of another by asking Tamisha if she advised the prosecutor of this prior activity. While Pinney's counsel later acknowledged in response to the court's questioning that he had "brought up" the question of whether there had been prior, similar activity, in context we think he cannot fairly be understood to have conceded anything other than that the possibility of earlier similar conduct was brought out during his cross-examination.

ceivable that it would have found that he acted by mistake or that the perpetrator was someone else.

The foregoing discussion also seems very much beside the point to any experienced litigator. The obvious reason the government wanted Jamila's testimony before the jury was because of the substantial likelihood that one or more members of the jury would use this highly inflammatory evidence for exactly the purpose Rule 404(b) declared to be improper—i.e., drawing the inference that Pinney was the kind of person who raped young girls and that, accordingly, he must have raped Tamisha.

The trial court was thus confronted with a situation in which the challenged evidence could have very little utility to the jury for any proper purpose and presented a very real danger of being used for an improper purpose to the serious and unfair detriment of the defendant. In other words, namely those of Rule 403, the trial court was faced with a situation in which the "probative value [of the challenged evidence was] substantially outweighed by the danger of unfair prejudice."

■■ We are mindful that a trial court is in a far better position than an appellate court to strike the sensitive balance dictated by Rule 403. See Harris, 938 F.2d at 420; United States v. Long, 574 F.2d 761, 767 (3d Cir.), cert. denied 439 U.S. 985 (1978). When a trial court engages in such a balancing process and articulates on the record the rationale for its conclusion, its conclusion should rarely be disturbed. Harris, 938 F.2d at 420; Long, 574 F.2d at 767. In this case, however, the trial court did not explain why it was denying defendant's motion under Rule 403 and the reason for doing so is not otherwise apparent from the record. We are thus unable to defer to the reasoning of the trial court. Moreover, given the emotionally charged content of Jamila's testimony, its de minimus probative value to the jury in fulfilling its responsibilities, and the very real danger of its misuse, we are unable to conceive of a rationale that would persuasively support the admission of that testimony.

## V.

Finally, we must evaluate the significance of the cautionary advice that the trial judge gave to the jury in its final instructions. Those instructions ruled out the use of Jamila's testimony for the improper purpose foreclosed by Rule 404(b), and, indeed, for any

422

purpose other than accident or mistake and common plan or scheme. The former purpose we have found to be proper and the latter, while not appropriate, was arguably innocuous since identity was not a disputed issue. Thus, if we could be confident that the members of the jury were able to follow the instructions of the court, we would conclude that the risk of unfair prejudice did not outweigh the very limited probative value of the proffered evidence.

■ As the Supreme Court has recognized, however, courts must take a realistic view of the capabilities of the human mind and must, therefore, acknowledge that there are situations in which the risk that jurors will not follow the court's instructions is unacceptably high. In Bruton v. United States, 391 U.S. 123, 135 (1968), for example, the Court noted that "there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." Given the emotionally charged content of Jamila's testimony, we conclude that this is such a situation. See Fawbush, 900 F.2d at 152 (in prosecution for sexual molestation of a child, testimony of defendant's children that he had sexually abused them as children found so "inflammatory" that instructions limiting its use to "motive, intent, preparation, plan or absence of mistake or accident" did not significantly reduce the risk of use for an improper purpose).

## VI.

■ Accordingly, we will reverse Pinney's conviction and remand the case to the district court for a new trial.