UNITED STATES of America,

v.

Louis GATTO, Sr., a/k/a Streaky, Louis Gatto, Sr., Appellant in 91–5949

v.

Alan GRECCO, a/k/a Alan Wolshonak, Alan Grecco, Appellant in 91–5950.

Nos. 91–5949 and 91–5950.

United States Court of Appeals, Third Circuit.

Argued Nov. 2, 1992.

Decided May 18, 1993.

Sur Petition for Rehearing June 21, 1993.

Salvatore T. Alfano (Argued), Clapp & Eisenberg, Newark, NJ, for appellant Louis Gatto, Sr.

Richard F.X. Regan (Argued), Hayden, Perle & Silber, Weehawken, NY, for appellant Alan Grecco.

Michael Chertoff, U.S. Atty., R. David Walk, Jr. (Argued), Asst. U.S. Atty., Newark, NJ, for appellee.

BEFORE: SLOVITER, Chief Judge, STAPLETON and LAY,* Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

Louis Gatto, Sr. and Alan Grecco were found guilty by a jury of violating the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 *et seq.*, and other federal criminal statutes. Each was sentenced to sixty-five years in prison and appeals the judgments of conviction and sentence, which we will affirm. We write to address the claim that the district court erred in allowing a witness to testify and the prosecution to comment in closing argument about the allegedly threatening conduct during trial of Grecco and a courtroom spectator.[1]

### I.

### A.

Gatto and Grecco were tried on charges that they conspired to violate RICO by agreeing to conduct the affairs of a faction of the Genovese Family of the Mafia through a pattern of racketeering activity involving the operation of an illegal sports gambling business and an illegal numbers gambling business. Six predicate acts were alleged to have formed the pattern of racketeering activity.[2] The Indictment also charged defen-

---

* Honorable Donald P. Lay, United States Circuit Judge for the Eighth Circuit, sitting by designation.

1. We have considered and now reject the numerous other allegations of constitutional and evidentiary error pressed by defendants, including: error in refusing to ask a proffered question during *voir dire;* error in not resuming *voir dire* during trial after a juror claimed to be "fed up"; violations of the *Brady/Giglio* doctrine and the Jencks Act; errors in admitting a dying declaration, certain out-of-court statements, a co-conspirator's guilty plea, and other evidence; error in restricting cross-examination of a witness and precluding the defense from calling an expert witness; cumulative error denying defendants a fair trial; violations of due process and erroneous application of the Sentencing Guidelines in calculating defendants' sentences; insufficiency of the evidence; error in permitting prosecutori-

al "vouching"; error in failing to specifically instruct the jury that it had to agree unanimously as to which unlawful debt Gatto collected; and error in that predicate acts five and six and counts three and four of the RICO charges were multiplicitous.

2. The first racketeering act charged defendants with conspiring to acquire the competing gambling business of Arthur and Robert Belli by extortion and by murdering Arthur Belli. The second charged that Grecco and others conspired to obtain another gambling business by extortion. The third charged that defendants conspired to murder Vincent Mistretta; the overt act alleged was Grecco's murder of Mistretta. The fourth charged Grecco with using extortionate means to collect an extension of credit. The fifth, which was identical to count three of the Indictment, charged defendants with running an illegal sports gambling business, and the sixth,

dants with using interstate telephone facilities in aid of racketeering, in violation of 18 U.S.C. §§ 1952 and 2; interstate travel in aid of racketeering, in violation of 18 U.S.C. §§ 1952 and 2; and interstate transportation of gambling records, in violation of §§ 1953 and 2.

The jury found that all predicate acts had occurred as alleged[3] and convicted both defendants on all counts. The district court had subject matter jurisdiction pursuant to 18 U.S.C. § 3231, and our jurisdiction rests on 28 U.S.C. § 1291. The following account of the facts views the evidence in the light most favorable to the government.

### B.

Gatto and Grecco allege that the district court erred in admitting certain testimony of government witness Robert Belli and in allowing the prosecutor to comment on this testimony during closing argument to the jury. The government called Robert Belli to testify about the extortionate takeover of a gambling business run by him and his brother, Arthur Belli. Robert testified that after Arthur went to jail, he and defendant Grecco ran the business. Grecco told him "things are going to be different," App. 2267, however, and shortly thereafter Robert's hot dog truck was blown up and he was beaten by two men with baseball bats. As a result, Robert surrendered the business. Robert

also testified that Arthur Belli disappeared shortly after he was released from prison and began planning to return to the gambling business.

On cross, Robert Belli readily agreed with defense counsel's suggestion that the prosecution had paid him and pressured him to testify as he did and that the local police and prosecutors involved in the case were corrupt. On redirect, the prosecutor sought to show that Belli had become hostile to the government and accommodating to the defense because he had been intimidated. The prosecutor first questioned Belli about Frank Sesta, a.k.a. "Moe Brown." Belli stated that after defense investigators hounded him into meeting with defense counsel, Moe Brown took him to the meeting; that Brown had pressed him to let an associate drive him to a pretrial hearing but that he declined, instead taking a ride from a government investigator and asking that the associate's license plate be checked; that Brown took him to a job interview the day before he testified at trial; and that Brown had discussed the case with him more than once and had said to him "isn't it a shame about Little Al [Grecco] in this case," App. 2528–29.

The prosecutor then elicited testimony from Belli that Moe Brown had been in the courtroom while he testified, standing in the back directly in front of him, and that Brown had looked unhappy.[4] Defense counsel ob-

---

identical to count four, charged defendants with running an illegal numbers gambling business.

3. The jury found defendants not guilty of conspiring to take over the Belli gambling business by means of the murder of Arthur Belli, which was one of two alleged means of committing that predicate act.

4. The exchange went as follows:
Q: Now, you saw Moe Brown when you took the stand on Tuesday, didn't you, sir?
A: Correct.
     *     *     *     *     *     *
Q: He was in the courtroom but he wasn't seated, was he, sir?
A: No.
Q: No, he wasn't. What was he doing, sir?
A: Standing in the back.
     *     *     *     *     *     *
Q: By that little door that is directly in front of you all the way in the back of the courtroom. Is that right, sir?
A: Correct.

Q: That's where Moe Brown, the man who said isn't it a shame about Little Al, stood when you took the stand on Tuesday. Is that correct?
A: That's correct.
Q: What did he look like. Did he look happy when he was standing by the door?
Mr. Feinstein [counsel for Gatto]: I object.
Court: If the witness can answer, let him answer. If he can't, he can't.
A: He looked the same as he always looked.
Q: That happy, sir?
A: No.
App. 2530–31. The court had declared Belli a hostile witness and had permitted the prosecution to ask leading questions on redirect. At sidebar following this exchange, the judge stated that he had noticed Brown standing in the back and thought it strange because the courtroom was only half-filled.

jected but stated no grounds. Later in the trial, the prosecution introduced evidence that Brown had been seen during surveillance near the Lodi Social Club, where Gatto and Grecco often met with associates, and had been seen talking with William Odierno, an original codefendant who worked in defendants' gambling business. The prosecution also introduced a tape of a conversation between Louis Gatto, Jr. (defendant Gatto's son) and Grecco, involving defendants' gambling business, in which Moe Brown was mentioned by name.[5]

Following the questions about Moe Brown, the prosecutor examined Belli about Grecco. Belli testified that he feared Grecco and feared another beating. The prosecutor then asked Belli about three occasions during the trial when Grecco had looked at him. The first was before Belli testified, when Grecco passed by Belli in the courthouse hall. Defense counsel's objection at this point was overruled.[6] The second look came when Belli was in the back of the courtroom waiting to testify, and Grecco turned his chair around to look at him. The third look occurred when Grecco stood up and looked at Belli during a sidebar while Belli was on the stand.

The prosecutor asked Belli if Grecco had ever looked at him that way before. Belli said Grecco had, when he was angry, as when Grecco told him "things are going to be different" before he was beaten. The court overruled a defense objection that the prosecutor had misstated the date on which Grecco allegedly made the statement. Counsel stated a final objection after redirect had ended and the jury had been sent home for the day.[7]

The prosecutor began his closing argument by briefly reviewing the evidence tending to show that Gatto and Grecco ran an enterprise as defined by RICO. After noting some of the evidence concerning the organization's use of violence, the prosecutor turned to Moe Brown and the evidence linking him to defendants and to Robert Belli. He then recounted Belli's testimony about Brown's presence in the courtroom, telling the jury that "you actually saw this organization attempt to intimidate a witness right here in front of you in court," App. 7444, and:

> You know, Moe Brown by himself, he's not an intimidating person. But Moe Brown is not here in an individual capacity, he's here as a representative. He's here as a reminder. He's here to deliver a message.

App. 7449.

The prosecutor then stated "that's not the only thing this organization did with Robert

---

**5.** After redirect, defense counsel called Moe Brown to the front of the courtroom and questioned Belli on recross. Belli agreed with counsel that Moe Brown was a "dear friend" and leading citizen of Lodi, that Brown had given him rides on occasion because he had lost his license, and that Brown was a "religious person," a "charitable, benevolent person," and a "sweet, sweet guy." Recross concluded with Belli agreeing that he understood that in their conversations about the trial, Brown never had any ill-intentions, and that, in fact, he loved Moe Brown. See App. 2621–26.

**6.** Mr. Feinstein: I object, Judge. I object for other reasons. Mr. Grecco and I went to the phone to use the phone there. I was with him at that time and the government knows it. That's totally unfair.

Court: Objection overruled.
App. 2616.

**7.** Mr. Feinstein: One last matter: I absolutely object to [the prosecution] bringing in front of this jury, Judge, things that have occurred in this courthouse which, in essence, are innocuous and are part of a trial. When Mr. Grecco passed Mr. Belli in the hall, he was going to the phone with me to make a call about this particular matter and Mr. Belli was in this particular place with an [FBI] agent.

And secondly, Judge, to say that while we were at sidebar Mr. Grecco stood up or he sat down and he looked at the witness, that's a right of any defendant in a courtroom. I submit that's unfair. I'm going to try to get you some cases, I know there are cases where prosecutors point out what a defendant is doing at counsel table, for example, but I would like to put it on the record at this time.

Mr. Querques [counsel for Grecco]: I join, Judge.

\* \* \* \* \* \*

Court: I'll tell you what my reaction is: I'm not passing judgment on Mr. Sesta, on Mr. Grecco or Mr. Belli. I don't know what occurred but—and you have a perfect right to place your version on the record through testimonial evidence at any time, if you care to. That's your choice. And your client's, needless to say.

But, to dismiss it out of hand as unfair, per se, is at war with reality, which sometimes occurs. I'm not suggesting it occurred here. It may have, it may not have.
App. 2630–31.

Belli," and reviewed Belli's testimony about Grecco's three looks. He concluded:

> Ladies and gentlemen, the audacity of this defendant [Grecco] to stand up and attempt to intimidate a witness who is testifying before you in United States District Court is breathtaking. It is the audacity of a man who would slap the son-in-law of a Chief of Police to collect an illegal debt. It is the audacity of a man who would murder another person [Vincent Mistretta] at eight o'clock in the evening on the doorstep of the house in which he is staying.

> Ladies and gentlemen, despite the fear these defendants and their organization inspire, despite the efforts that they have made to hide themselves behind layers of underlings and insulate themselves by hierarchy, the care they have taken to avoid detection, the evidence that has been presented in this has given you an overwhelmingly clear picture of these defendants, their criminal organization and the criminal activities that they have committed and caused to be committed in furtherance of their criminal organization.

App. 7451.

After the lunch recess following the prosecution's closing, defense counsel objected to the comments about Grecco's looks on the ground that Grecco had a right to be in the courtroom and to confront witnesses face-to-face. Counsel stated that although he would not object to evidence concerning Grecco's conduct outside the courtroom, it was "totally unfair to allow inferences to be drawn from that conduct in a courtroom." App. 7531–32. The judge responded that since Grecco's looks were arguably threats, they could be considered by the jury as evidence of consciousness of guilt.

### C.

Based on the foregoing testimony and comment, Gatto and Grecco allege violations of their constitutional rights, including the Fifth Amendment right against compelled self-incrimination, the Fifth Amendment due process rights to a fair trial and to be judged solely on the basis of evidence adduced at trial, and the Sixth Amendment right to confront adverse witnesses. If we find constitutional error, we must reverse unless it is harmless beyond a reasonable doubt. *Arizona v. Fulminante*, —— U.S. ——, ——, 111 S.Ct. 1246, 1263, 113 L.Ed.2d 302 (1991); *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *United States v. Jannotti*, 729 F.2d 213, 220 (3d Cir.), *cert. denied*, 469 U.S. 880, 105 S.Ct. 243, 244, 83 L.Ed.2d 182 (1984). Defendants also allege that the admission of Belli's testimony violated Federal Rule of Evidence 404(a), which prohibits, with certain exceptions, the admission of character evidence to prove action in conformity therewith. Rulings on the admission of evidence are generally reviewable for abuse of discretion, *United States v. Leo*, 941 F.2d 181, 188 (3d Cir.1991), but in the absence of a timely and specific objection, we review for plain error. *United States v. Gibbs*, 739 F.2d 838, 849–50 (3d Cir.1984) (en banc), *cert. denied*, 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985); Fed.R.Crim.P. 52(b).

Gatto and Grecco purport to find support for their claims in *United States v. Schuler*, 813 F.2d 978 (9th Cir.1987), and three cases there discussed. In *Schuler*, the prosecutor stated in closing argument that defendant, who did not testify at his trial for threatening to kill the President, had laughed during testimony about other violent threats he allegedly made. This laughter was not the subject of testimony at trial. The court held that the prosecutor's comment violated Rule 404(a) by introducing character evidence solely to prove guilt, violated defendant's due process right not to be convicted except on the basis of evidence adduced at trial, and may have impinged on the Fifth Amendment right not to testify. *Id.* at 980–81.

In *United States v. Wright*, 489 F.2d 1181 (D.C.Cir.1973), the prosecutor told the jury in closing argument that defendant's demeanor showed that he found the murder charges against him humorous. Defendant did not testify and his demeanor was not in the record as evidence. The court found the comment improper because "the prosecutor is forbidden to introduce evidence of the bad character of the accused simply to prove that

he is a bad man likely to engage in criminal conduct." *Id.* at 1186. In a similar vein, in *United States v. Pearson*, 746 F.2d 787 (11th Cir.1984), the prosecutor went beyond the evidence in closing argument and asserted that defendant had been moving his leg up and down during trial, demonstrating his nervousness and fear. The court held that this comment constituted an indirect comment on defendant's choice not to testify, introduced character evidence solely to prove guilt, and violated the right not to be convicted except on the basis of evidence admitted at trial. *Id.* at 796.

Finally, in *United States v. Carroll*, 678 F.2d 1208 (4th Cir.1982), the prosecutor told the jury in closing argument that defendant, who elected not to testify at his trial for bank robbery, had examined bank surveillance photographs with his lawyer during trial because he knew about the photographs from having been in the bank to rob it. The court held that the prosecutor's comment, which was not based on evidence in the record, violated the Sixth Amendment rights to be represented by and to assist counsel, the Fifth Amendment rights not to testify and not to be convicted except on the basis of evidence adduced at trial, and Rule 404(a). *Id.* at 1209–10. Citing *Wright*, the court noted that the prosecutor had improperly introduced evidence of character solely to prove guilt. *Id.* at 1210.

We first address the argument that Belli's testimony was improperly admitted into evidence. We then turn to the challenge predicated on the prosecutor's comments in his closing argument. As will become apparent, we find *Schuler*, *Wright*, *Pearson*, and *Carroll* distinguishable.

## II.

### A.

■ Although Rule 404(a) prohibits character evidence to prove conduct in conformity therewith, Rule 404(b) allows evidence of "other crimes, wrongs, or acts" for other purposes. It is well-established that evidence of threats or intimidation is admissible under Rule 404(b) to show a defendant's consciousness of guilt,[8] as well as to impeach a witness whose testimony was influenced by such conduct.[9] *Schuler* and the other cases cited by defendants are consistent with this rule, as in these cases the summation comments were made for the prohibited purpose of using character evidence to show guilt.

In allowing threat evidence for other purposes under Rule 404(b), courts have applied the same standard to threats occurring inside and outside the courtroom. In *United States v. Mickens*, 926 F.2d 1323 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 940, 117 L.Ed.2d 111 (1992), for instance, a prosecution witness testified that defendant made a hand gesture in the shape of a gun when the witness entered the courtroom. The court found the testimony admissible under Rule 404(b) because it was not offered to prove bad character or criminal propensity, but to prove consciousness of guilt. *Id.* at 1329. Similarly, in *United States v. Maddox*, 944 F.2d 1223, 1230 (6th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 610, 116 L.Ed.2d 633 (1991), the court held that a government witness, who thought that a defendant mouthed the words "you're dead" to her while she was on the stand, was properly allowed to testify about the threat even though the trial court, based on "findings" made outside the presence of the jury, concluded that the witness had misinterpreted

---

**8.** *See, e.g., United States v. Marks*, 816 F.2d 1207 (7th Cir.1987); *United States v. Guerrero*, 803 F.2d 783 (3d Cir.1986); *United States v. Gonsalves*, 668 F.2d 73 (1st Cir.), *cert. denied*, 456 U.S. 909, 102 S.Ct. 1759, 72 L.Ed.2d 168 (1982); 22 C. Wright & K. Graham, *Federal Practice and Procedure* § 5240, at 476 (1978) ("Though it may permit an inference as to the conduct of the party, the basic relevance of spoliation evidence is to show a consciousness of guilt; as such it is not necessary to make any inference as to the character of the spoliator to reach the conclusion

that his subjective state of mind is incompatible with the position being asserted in the litigation.").

**9.** *See, e.g., United States v. Adams*, 759 F.2d 1099 (3d Cir.), *cert. denied*, 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985); *United States v. Qamar*, 671 F.2d 732 (2d Cir.1982); *Hall v. United States*, 419 F.2d 582 (5th Cir.1969); C. Wright & K. Graham, *Federal Practice and Procedure* § 5240, at 474 (1978).

defendant's conduct.[10]

█ In the present case, Robert Belli's testimony concerning Moe Brown was admissible under Rule 404(b) both for impeachment and to show consciousness of guilt. As was argued at sidebar during trial, the prosecution believed that Belli's testimony on cross had been favorable toward the defense because he had been intimidated. The questions about Moe Brown's actions before and during trial were aimed at persuading the jury that Belli's testimony had been influenced by Brown. To the extent it was offered for this purpose, it was unnecessary for the prosecution to convince the jury of a connection between Brown and the defendants. Belli's testimony regarding Brown would thus have been admissible without evidence of such a connection.

█ Belli's testimony concerning Brown was offered to show defendants' consciousness of guilt, as well. While Brown was not himself a defendant charged with the acts of the organization, there was evidence in the record—surveillance photographs and a taped conversation, in addition to Belli's testimony about Brown's conduct before the trial—that could be viewed as suggesting a link between Brown and the defendants' organization. Although this evidence would have been insufficient to convict Brown for the criminal activity charged to the organization, we believe it was sufficient to permit a juror to infer that Brown may have been acting at the behest of defendants and to consider that inference, along with all the other evidence, in reaching a verdict.[11]

The testimony concerning the three occasions during trial on which Grecco looked at Belli was admissible on the same grounds. Belli stated repeatedly that he feared Grecco.

His testimony about Grecco's looks was offered to suggest to the jury that this fear continued, indeed was heightened, during trial, and that it could have accounted for Belli's eagerness to agree with the defense on cross and his reluctance to give information on direct. This testimony was also admissible as tending to show Grecco's consciousness of guilt. It was for the jury to decide, based on its assessment of Belli with the benefit of both direct and cross-examination, whether Grecco's conduct did in fact reveal his state of mind. We thus reject defendants' assertions of plain error in the admission of the challenged testimony from Belli.

### B.

█ Our conclusion that Belli's testimony was properly admitted, of course, bears importantly on the propriety of the prosecutor's closing argument. When, as in *Schuler*, *Wright*, *Pearson*, and *Carroll*, the prosecutor comments in closing on defendant's courtroom conduct without any supporting evidence in the record, the defendant's Fifth Amendment due process rights to a fair trial and to be judged solely on the basis of evidence admitted at trial are violated. In such a case, the defendant has not had a fair opportunity to introduce evidence supporting an inference contrary to the one being suggested by the prosecutor, and the jury is being asked to accept the word of the prosecutor about conduct to which its attention was not called during trial. Moreover, the defendant's Sixth Amendment right to confront adverse witnesses is violated in such a case because there has been no opportunity for the defendant to cross-examine the prosecutor. There were no such problems in this case, however. Belli testified before the jury

---

10. The trial court was informed of the alleged threat after the witness completed her testimony. Although defendant denied making the threat and the court concluded that the witness had misinterpreted his conduct, it allowed her to retake the stand because she claimed the threat had distracted her and made her unable to concentrate on her previous testimony. On cross-examination, defense counsel asked her to tell the jury what had distracted her, and she said that defendant had threatened her. The Sixth Circuit held that such evidence of threats was generally admissible because probative of consciousness of guilt, and that a trial court was not required to make a finding that the threat actually occurred before admitting the evidence. 944 F.2d at 1230.

11. This case is thus different from *Dudley v. Duckworth*, 854 F.2d 967 (7th Cir.1988), *cert. denied*, 490 U.S. 1011, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989), and *United States v. Rios*, 611 F.2d 1335 (10th Cir.1979), where threats allegedly occurred but there was no evidence linking them to the defendant.

from the witness stand regarding the courtroom conduct of Grecco and Brown and, as the district court pointed out, Gatto and Grecco had opportunities both to cross-examine Belli and to offer other evidence rebutting the inference which the prosecution was suggesting.[12]

With respect to the Fifth Amendment right to be free from compelled self-incrimination, we acknowledge some uncertainty on our part as to the basis for the suggestions in *Schuler, Pearson,* and *Carroll* that a violation of this right occurred in those cases.[13] We are confident in this case, however, that nothing in the prosecutor's closing argument or the evidence on which it was based can fairly be said to have compelled Gatto or Grecco to testify against themselves in any constitutionally relevant sense [14] or to have constituted a comment on their failure to take the stand.

## C.

■ Although we have little difficulty rejecting the allegations of evidentiary and constitutional error in this case, we do not mean to suggest that testimony regarding a criminal defendant's courtroom behavior should be permitted whenever it is found to be relevant. As we stated in *United States v. Guerrero,* 803 F.2d 783 (3d Cir.1986), evidence of threats "constitute[s] a striking example of evidence that 'appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish,' or otherwise 'may cause a jury to base its decision on something other than the established propositions in the case.'" *Id.* at 785 (citations omitted). At the same time, testimony that an individual being tried for a serious crime looks unhappy during the trial or appears irritated at someone who is testifying for the government will in many instances have very little tendency to demonstrate consciousness of guilt. As a result, evidence alleged to show intimidation through the defendant's demeanor may frequently be excludable under Federal Rule of Evidence 403, which instructs that relevant evidence may be excluded if its probative value is substantially outweighed by, among other things, the danger of unfair prejudice.[15] The Rule thus

12. The distinction between a case in which the prosecutor's closing comment on courtroom conduct is supported in the evidence and one in which there is no such support is illustrated by another case relied upon by Gatto and Grecco. In *Hall v. United States,* 419 F.2d 582 (5th Cir. 1969), the court explained that in considering a prosecutor's charge of witness tampering, made in closing argument without support in evidence, the issue was "not one of admissibility but of comment." *Id.* at 585. Although evidence of tampering might well have been admissible, the charge "was supported only by the improper implication that there was existent, but unstated, evidence of which the jury did not have the benefit." *Id.* & n. 1. Similarly, the prosecutor's assertion that a witness was afraid of defendant was "a bald assertion of fact not in evidence and therefore improper." *Id.*

13. These cases appear to advance different rationales. In *Schuler,* the court noted both that prosecutorial comment on a defendant's non-testimonial behavior would not violate the right to remain silent in every case, and that it doubted that jurors would construe the comment on Schuler's laughter as referring to his failure to testify. The court was nonetheless concerned that such comment "will tend to eviscerate the right ... by forcing the defendant to take the stand in reaction to or in contemplation of the prosecutor's comments." 813 F.2d at 982. In *Carroll,* which the *Schuler* court quoted in its

discussion, the court viewed defendant's Fifth and Sixth Amendment rights together, concluding that "[i]n tandem, defendant had the right to a jury trial at which, if he elected not to testify, the fact of his presence and his non-testimonial behavior in the courtroom could not be taken as evidence of guilt." 678 F.2d at 1209. Finally, in *Pearson,* the court stated that the improper summation comment constituted an indirect comment on defendant's failure to testify. 746 F.2d at 796. Because the prosecutorial conduct we review here differs markedly from that involved in these cases, we venture no opinion as to whether we would adopt one or more of these rationales if faced with similarly improper conduct in a future case.

14. The Fifth Amendment bars the admission of compelled *testimonial* evidence. It does not bar evidence of a defendant's *non-testimonial* conduct in or out of the courtroom. *See Schmerber v. California,* 384 U.S. 757, 764, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908 (1966).

15. *See, e.g., United States v. Qamar,* 671 F.2d 732, 736 (2d Cir.1982) (explaining that although potential prejudice from evidence of death threats may be great, such evidence should be subjected to the same Rule 403 balancing test as other relevant evidence); *United States v. Monahan,* 633 F.2d 984, 985 (1st Cir.1980) (holding that admission of threat of unspecified harm did

calls for "balancing the probative value of and need for the evidence against the harm likely to result from its admission." Fed. R.Evid. 403, Advisory Committee Notes.

■ Here, however, the district court did not undertake such a balancing because neither defendant objected on the basis of Rule 403. As we have noted in recent decisions, a trial court is in a position superior to that of an appellate court to strike the balance required by Rule 403. Accordingly, when the trial court engages in such balancing and articulates its reasoning on the record, its ruling will rarely be disturbed. *United States v. Sampson,* 980 F.2d 883, 889 (3d Cir.1992); *Government of Virgin Islands v. Pinney,* 967 F.2d 912, 917 (3d Cir.1992). As a corollary, when a trial court is not given the opportunity to exercise its discretion in striking the balance, we will seldom find plain error, and we do not find it here.

### III.

We will affirm the judgments of the district court against Gatto and Grecco.

BEFORE: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ROTH, LEWIS, and LAY,** Circuit Judges

SUR PETITION FOR REHEARING

June 21, 1993.

The petitions for rehearing filed by appellants in the above-entitled cases having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.

not contravene Rule 403 but reserving question whether an "inflammatory or macabre" threat should be excluded).