# SEASONS OF ST. THOMAS CUSTOM TAILORING, Appellant
## v.
# HEATHER BROOKS, Appellee

D.C. Civil App. No. 2006-157

District Court of the Virgin Islands

Division of St. Thomas and St. John, Appellate Division

July 2, 2009

SEASONS OF ST. THOMAS CUSTOM TAILORING, St. Thomas, USVI, *Pro se*, Appellant.

The Appellee has not made an appearance.

GÓMEZ, *Chief Judge of the District Court of the Virgin Islands*; FINCH, *Judge of the District Court of the Virgin Islands*; and D'ERAMO, *Judge of the Superior Court of the Virgin Islands, Division of St. Croix, sitting by designation.*

## MEMORANDUM OPINION

### (July 2, 2009)

Seasons of St. Thomas Custom Tailoring ("Seasons") appeals from a money judgment entered against him and in favor of Heather Brooks ("Brooks") by the Superior Court of the Virgin Islands, Division of St. Thomas and St. John (the "Superior Court"). For the reasons stated below, the Court will affirm the judgment below.

## I. FACTS

On the evening of April 28, 2006, Kirk Rondon ("Rondon") the owner of Seasons, telephoned Brooks and requested her assistance performing last-minute seamstress work on several costume shirts for the Rising Stars Youth Steel Orchestra (the "Rising Stars"). The Rising Stars planned to wear the costumes on April 29, 2006, in the St. Thomas carnival adult's parade. Brooks agreed to do the work. At approximately 8:00 p.m. on April 28, 2006, Rondon delivered between forty and forty-three shirts to Brookes. Brooks worked through the night on the project.

On the morning of April 29, 2006, Rondon sent his daughter, Kassi Rondon, to pick up the shirts from Brooks. Later that day, Brooks discovered that she had neglected to include two shirts with the others she returned to Rondon.

Rondon was unsatisfied with the work Brooks had done. Seasons refused to pay the bill. On May 26, 2006, Brooks commenced an action

for debt against Seasons in the small claims division of the Superior Court. Brooks sought to recover $1,025 for the unpaid seamstress work. On July 10, 2006, Seasons filed an answer denying that it owed Brooks $1,025. Also on July 10, 2008, Seasons filed a counterclaim against Brooks. The counterclaim requested a total of $440 for labor and materials for the two shirts in Brooks' possession, plus the cost of hiring two workers to fix the alleged mistakes in Brooks' work.

This matter was tried on July 11, 2006. Brooks testified on her own behalf, explaining:

> [Rondon] told me it is only the sleeves to sew in and to sew down the sides. But when he brought me [the shirts] I see it was more than that because he didn't tell me about the flap to go on the shoulder.
>
> . . .
>
> As soon as he left, I started to do them. He I sew them all night. I finished them after 8:00 [a.m.] the next day.
>
> . . .
>
> When I finish them, I called him and let him know they are ready. Before I did that, I count them twice and I count 41 . . . .
>
> I make up a bill. It is not a receipt but a receipt book. I pulled a page from a writing pad and I make up a bill for $25 for each one, and his daughter came and picked them up.

(Trial Tr. 4-5, July 11, 2006.) Brooks stated that she notified Rondon when she noticed the two shirts on the floor after the bulk of the shirts had already been picked up. During that conversation,

> [Rondon] didn't mention nothing about the bill. By that time he should have the bill. This was around 3:00 in the afternoon.

(*Id.* at 6.) Approximately two weeks later, Brooks called Rondon, who informed her that he would not pay the $1,025 bill.

The trial judge asked Brooks:

> Q: Did you agree on a price per costume when you decided to do this work?

A: No. I helped him out over the years since he has been sewing for the Rising Stars a couple of times. . . . Never discussed price with him.

. . .

Q: What arrangements did you have with him on those prior occasions with those prices?

A: We had no arrangement. . . .

Q: You submitted your bill and he would pay?

A: Yes.

(*Id.* at 7-8.)

Rondon, on behalf of Seasons, testified:

I know Heather [Brooks] a long time. She has done work for me over the years; we always been fair with each other. And usually the prices, we always agree on the prices sometimes after, most times after the work is done. But it is always in accordance with what we are being paid to do the job.

(*Id.* at 12.) Rondon explained that, when he dropped off the costumes on the evening of April 28, 2006,

I explained to [Brooks] exactly what I want done.

I wanted to have some sleeves put in the size clothes, press some shirts for me. Forty-two shirts I took to her.

(*Id.* at 13.) Several hours later, Rondon telephoned Brooks:

I said to her I don't have anybody with me right now to send for them, so why don't you do an additional favor turn up the front of the shirts for me. She said okay.

When I called her back, probably 4:00 [a.m.] or something like that, I asked her if she was finished. . . . She said I'm sewing them up.

I didn't ask you to sew them up. She were just supposed to iron up, turn up the front of the shirts. She said, well, I can't iron. Stop whatever

you are doing. Don't sew anymore. I'm going to have my daughter come for it . . . .

And when my daughter did go pick them up . . . it wasn't a good job. Most of the shirts were uneven to the sides; the fronts were sewn. We had to rip those back down.

And I had to go find two more people to help me undo most of the work she had done especially the front. Most of them on the side I had to take them apart to set them back up right to get them finished.

I do have a sample of the shirt we actually made for the steel band here, if I could present it to you.

[THE COURT]: I'm not interested in that sir.

(*Id.* at 13-15.)

Because he was busy during carnival, Rondon explained, he did not actually open the envelope containing the bill for $1,025 that Brooks gave to Kassi Rondon. Rondon testified that, when Brooks subsequently called him to ask about the bill:

I told her I'm going to have to deal with this bill; I'm going to come and see her. We need to sit down and discuss this because for the job that she did for me, at the space of time she think she did it, this price is excessive.

. . . . [S]he hang up her phone.

Then I called her back. About maybe two days after I left a message on her machine stating I'm going to come over to her house on the weekend; we're going to get it all straightened out.

Then the next day I came to work I met a message from her on my answering machine, very abusive . . . . I chose not to go to her house or not to call her again.

(*Id.* at 16.) Rondon offered as evidence an audio recording of the message Brooks left on his answering machine, but the trial judge did not hear the tape.

Seasons attempted to call Barbara Holder ("Holder"), a local wedding planner and seamstress as a witness. However, before Holder gave any testimony, the trial judge found that Holder's testimony would be irrelevant to the trial and asked her to step down from the witness stand.

Finally, Kassi Rondon testified on behalf of Seasons regarding her experience picking up the shirts from Brooks.

> When we brought them back and took them out of the bag some of them were uneven, the stitching.
>
> She hemmed up the front which she was not supposed to so we had to rip out everything she did except some of the seams for the sleeves were not sewn in properly. The seams were not pinned down so we had to do all of that.

(*Id.* at 24.)

At the conclusion of the trial, the judge stated that both parties concurred that there was no agreement as to the price for the seamstress services in question before they were rendered. The Court then found that,

> based upon [the parties'] prior dealings, the price was that as would be reflected in whatever invoice, whatever bill the Plaintiff submitted for her services.
>
> The Court finds that even though the Defendant might have been dissatisfied with the work done by Plaintiff, that dissatisfaction did not go to the work that was requested but to the fact that the costumes were not ironed.
>
> It is clear that there was no agreement between the parties that the Plaintiff would iron the costumes once she had completed working on the sleeves.
>
> The Court finds that . . . the Plaintiff has proven by a preponderance of the evidence that she did perform the work requested by the Defendant, and for that work she is entitled to be compensated because even though here was no written agreement there was the understanding of the parties.
>
> She was not expected to work for free. She submitted the bill, which the Court finds reasonable under the circumstances.

(*Id.* at 32.)

On August 15, 2006, the Superior Court entered a judgment in favor of Brooks and against Seasons in the amount of $1,025, plus $40 in court costs.[1] Seasons timely appealed from the August 15, 2006, judgment.

## II. JURISDICTION & STANDARD OF REVIEW

This Court has jurisdiction to review final judgments and orders of the Superior Court of the Virgin Islands. *See* Revised Organic Act of 1954 23A, 48 U.S.C. § 1613a; Act No. 6730 § 54(d)(1) (Omnibus Justice Act of 2005.).

We review *de novo* questions of law, including issues of statutory interpretation. *Saludes v. Ramos*, 744 F.2d 992 (3d Cir. 1984). *Mapes Monde, Ltd. v. A.H. Riise Gift Shop, Inc.*, 337 F. Supp. 2d 704, 707, 46 V.I. 297 (D.V.I. App. Div. 2004); *see also Files v. ExxonMobil Pension Plan*, 428 F.3d 478, 486 (3d Cir. 2005). Findings of fact made by the Superior Court are not to be disturbed unless they are clearly erroneous. *Lenhart v. Richards*, 17 V.I. 619 (3d Cir. 1980); *T-Shirt World, Inc. v. Artland, Inc.*, 20 V.I. 147 (D.V.I. 1983).

The Superior Court's evidentiary decisions are reviewed for abuse of discretion. *Gov't of the V.I. v. Pinney*, 967 F.2d 912, 914, 27 V.I. 412 (3d Cir. 1992). "An abuse of discretion arises when the District Court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008). "Even if such abuse of discretion is found, reversal may be avoided if the error was harmless; a non-constitutional harmless error requires a high[ ] probability that the evidence did not contribute to the . . . judgment . . . ." *Texaco Antilles Ltd. v. Creque*, 273 F. Supp. 2d 660, 665 (D.V.I. App. Div. 2003) (quotations omitted) (alteration in original).

If the appellant fails to object to an error below, we review the matter for plain error. Under that standard, we may reverse the trial court's determination where there was a plain error that affected the litigant's substantial rights. *Selkridge v. United of Omaha Life Ins. Co.*, 360 F.3d 155, 167, 45 V.I. 712 (3d Cir. 2004)). Such error generally requires some "affirmative showing that the error [was] prejudicial. It must have affected

---

[1] The execution of that judgment was stayed until August 21, 2006.

the outcome of the district court proceedings." *id.* (citations and quotations omitted).

## III. ANALYSIS

### A. Exclusion of Evidence

Seasons argues that the Superior Court erred in disallowing Holder's testimony as evidence in the trial.

■ Pursuant to title 5, section 775 of the Virgin Islands Code ("Section 775"),

> [a] verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless (a) it appears of record that the proponent of the evidence either made known the substance of the evidence in a form and by a method approved by the judge, or indicated the substance of the expected evidence by questions indicating the desired answers, and (b) the court which passes upon the effect of the error or errors is of opinion that the excluded evidence would probably have had a substantial influence in bringing about a different verdict or finding.

V.I. CODE ANN. tit. 5, § 775. Thus, a verdict, finding, or judgment may not be set aside as the result of the improper exclusion of evidence unless the appellant can show: (1) that the substance of the excluded evidence was made known to the trial judge; (2) that the exclusion was erroneous; and (3) that the erroneous admission or exclusion of evidence probably had a substantial influence in bringing about the verdict or finding. *See id.*

Here, Seasons made the substance of Holder's testimony known to the Superior Court when it attempted to call her as a witness during the trial. Upon taking the stand, Holder was asked by the trial judge whether she had personal knowledge of the transaction at the heart of this case. Holder responded in the negative. The trial judge then asked Rondon:

> THE COURT: What is the relevance of her testimony, sir?
>
> [RONDON]: Well, the relevance of her testimony would be to establish the type of work we've done and the value of the work we've done in terms of establishing a price we pay for hiring someone for taking a job like this.

(*Id.* at 21-22.) Rondon also attested to Holder's personal knowledge of making the same costumes at issue in this case. The Superior Court nonetheless rejected Rondon's arguments and declared that Holder's would be irrelevant. The court reasoned that:

> [T]his is not about the making of shirts. These shirts were submitted to Ms. Brooks with respect to the sleeves.
>
> . . .
>
> So it's not the making of the entire shirt. I'm not going to permit her to testify. Her testimony is going to be irrelevant.

(*Id.* at 22.)

■ A trial judge has broad discretion in making evidentiary rulings, and such rulings are given great deference by the reviewing court. *See Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379, 128 S. Ct. 1140, 1144-45, 170 L. Ed. 2d 1 (2008) ("In deference to a district court's familiarity with the details of the case and its greater experience in evidentiary matters, courts of appeals afford broad discretion to a district court's evidentiary rulings."). While relevant[2] evidence may be admissible, 5 V.I.C. § 777; FED. R. EVID. 402,[3] the trial judge may exclude such evidence upon finding that

> its probative value is substantially outweighed by the risk that its admission will (a) necessitate undue consumption of time, or (b) create substantial danger of undue prejudice or of confusing the issues or of misleading the jury, or (c) unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered.

---

[2] " 'Relevant evidence' means evidence having any tendency in reason to prove any material fact." 5 V.I.C. § 771(2); *see also* FED. R. EVID. 401 (defining "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence").

[3] Federal Rule of Evidence 402 ("Rule 402") provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible." FED. R. EVID. 402.

*Id.* at § 885; *see also* FED. R. EVID. 403.[4] Deference to the trial judge is particularly appropriate in conducting the above inquiry, since it requires an "on-the-spot balancing of probative value and prejudice, potentially to exclude as unduly prejudicial some evidence that already has been found to be factually relevant." *Sprint/United Management Co.*, 128 S. Ct. at 1145.

██ Here, [t]he trial court clearly found that the parties' prior course of dealing involved the submission of an invoice by Brooks and payment of that invoice by Seasons. The judge thus found it reasonable in light of the parties' prior course of dealing to supply a price term of $1,025, as that was the price reflected in the invoice Brooks submitted to Seasons in connection with the Rising Stars project. Even if Holder's testimony was relevant, it was within the wide discretion of the trial judge to exclude such testimony and rule based on the other evidence presented at trial. *See* 5 V.I.C. § 885; *see also Sprint/United Management Co.*, 128 S. Ct. at 1146 ("[A] district court virtually always is in the better position to assess the admissibility of the evidence in the context of the particular case before it.").

## B. Seasons' Counterclaim

Seasons further contends that the Superior Court refused to consider his counterclaim, or any evidence related thereto.

█ Seasons' answer and counterclaim were timely filed pursuant to the Rules of the Superior Court of the Virgin Islands. *See* SUPER. CT. R. 34 ("All claims in the nature of recoupment, set-off, cross-action, or any other claim for relief, except a complaint or a third-party complaint, shall be asserted in an answer as a counterclaim, and not otherwise, *and shall be served and filed within the time limited for answering*.") (emphasis added); *see also* V.I. SUPER. CT. R. 32 (requiring that the defendant must file any answer and counterclaim "within twenty days after service of the summons and complaint"). Despite Season's assertion that the trial judge rejected his counterclaim, as of the date of this Memorandum Opinion, the Court has found nothing in the record to suggest that the Superior Court has disposed of Seasons' counterclaim. In fact, there is no evidence

---

[4] Federal Rule of Evidence 403 ("Rule 403") states that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403.

that the Superior Court has ever even considered the counterclaim. Rather, Seasons' counterclaim against Brooks remains pending in the Superior Court. Consequently, the counterclaim is immaterial to the instant appeal. *See, e.g., Elliott & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312 (3d Cir. 2006) (noting that the defendant's counterclaim was immaterial on appeal from a judgment on the underlying complaint because the counterclaim was still pending before the trial court).

## IV. CONCLUSION

For the foregoing reasons, the Court will affirm the Superior Court's August 15, 2006, judgment against Seasons. Additionally, the Court is confident that the Superior Court will schedule Seasons' counterclaim for disposition in a timely manner. An appropriate Order follows.