NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 11-2385,
11-2437 and 11-2538
_____

UNITED STATES OF AMERICA

v.

ABDULLAH MUHAMMAD,
Appellant No. 11-2385
_____

UNITED STATES OF AMERICA

v.

ANTHONY PETERSON,
Appellant Nos. 11-2437 and 11-2538
_____

Appeals from the United States District Court
for the District of New Jersey
(D.C. Criminal Nos. 2-09-cr-00265-003,
2-09-cr-00265-001 and 2-93-cr-00010-001
District Judge: Honorable Susan D. Wigenton
_____

Submitted Under Third Circuit LAR 34.1(a)
September 18, 2012

Before:  SLOVITER, RENDELL and HARDIMAN, Circuit Judges

(Opinion Filed: January 31, 2013 )
_____

OPINION OF THE COURT
_____

RENDELL, Circuit Judge.

In these consolidated appeals, Abdullah Muhammad and Anthony Peterson appeal the convictions and sentences they received following a jury trial on charges arising out of a bank robbery and ensuing high-speed chase. They raise numerous claims of error. For the reasons that follow, we will affirm the District Court's judgments of conviction and sentence as to Muhammad and Peterson.

I.

On March 12, 2009, it was nearing closing time at a Bank of America branch in Somerset, New Jersey, when four men drove a stolen Jeep Cherokee into the bank's parking lot. As one man waited in the car with the engine running, the other three entered the bank wearing gloves and masks of different United States presidents and carrying guns. Two of these masked men were identified at trial as Muhammad and Peterson. The men took the security guard's gun. They then ordered the tellers and the bank's sole patron to get down on the floor. One of the men then pointed his gun at the tellers and demanded cash; he then emptied the tellers' cash drawers into a bag.

A second man put a gun to a bank employee's head and ordered him to open the vault. The vault opened and the men removed cash. The men then ordered everyone in the bank to stay on the ground, and left the bank with, among other items, the security guard's gun and over $93,000 in cash. The cash included "bait bills" which contained two hidden GPS devices.

Several bystanders saw the robbers leave the bank and one witness called 911, reporting the Jeep's license plate. The witness also reported that the Jeep turned into an

apartment complex parking lot about 500 feet from the bank. In the lot, the robbers left the Jeep, still running, and a shotgun, and jumped into a stolen Ford minivan. The van left the parking lot as police officers entered to investigate. After an eyewitness reported the vehicle swap, which the officers reported over the police dispatch radio, another officer who was approaching the apartment complex observed the van and began following it.

During the ensuing chase, the robbers fired shots at the officer on the road and in an open square in New Brunswick, New Jersey. The officer radioed that shots had been fired. Ultimately, the chase continued through a residential area until the van crashed into a security gate at St. Peter's University Hospital. The robbers exited the van, and a firefight between them and the police ensued. The robbers ran through a residential neighborhood, some taking off layers of clothing as they ran. Finally, a police officer trapped the robbers in a cul-de-sac, where two of them pointed their guns at the police. The police fired, striking three of the four robbers. Police then arrested the four robbers.

Muhammad, Peterson, and another co-defendant were charged in the U.S. District Court for the District of New Jersey with three counts: (1) conspiracy to commit bank robbery by force and violence, or intimidation, contrary to 18 U.S.C. § 2113(a), in violation of 18 U.S.C. § 371; (2) armed bank robbery by force and violence, or intimidation in violation of 18 U.S.C. § 2113(a), (d), and § 2; and (3) use of a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii) and § 2. The co-defendant pleaded guilty. Muhammad and Peterson proceeded to trial on November 3, 2010.

During the five-day jury trial, the Government presented the testimony of bank employees, a bank security manager, and eyewitnesses to different stages of the escape, chase, apprehension, and subsequent investigation, including various police officers and detectives. One of the detectives testified as an expert in latent fingerprint processing, and another detective testified as an expert in firearms operation. An FBI forensic examiner also testified as an expert in DNA profiling and statistics. The Government also called the owners of the stolen vehicles as witnesses. Additional trial evidence included bank security camera footage, GPS devices, physical evidence found in the abandoned van (including the masks worn by the perpetrators), and audio recordings of police radio dispatches. The Government also introduced certain articles of clothing (*e.g.,* pants, sweatshirts, gloves, and shoes) that the police recovered from the defendants at the time of their arrest or shortly thereafter.

On November 9, 2010, the jury convicted Muhammad and Peterson of all three counts against them.[1] The District Court sentenced Muhammad to a within-guidelines imprisonment term of 225 months. The District Court calculated Muhammad's guideline range for imprisonment as 87 to 108 months based upon a total offense level of 27 and a criminal history category of III. Additionally, he received a mandatory consecutive sentence of 120 months on Count Three for use of a firearm during a violent crime under § 924(c).

---

[1] The jury also returned a unanimous verdict on a supplemental question that is not at issue here.

Peterson also received a within-guidelines imprisonment term, totaling 562 months.[2] Having previously been convicted of a crime under 18 U.S.C. § 924(c), Peterson's mandatory minimum consecutive sentence on Count Three was 25 years. The District Court also entered a revocation judgment against Peterson, who was on supervised release at the time of the robbery. For the revocation, the District Court sentenced him to an additional 81 months to be served consecutively with his sentence on the robbery charges.

Muhammad and Peterson timely filed notices of appeals. The District Court had jurisdiction over these cases under 18 U.S.C. § 3231. Our Court has jurisdiction to review judgments of conviction under 28 U.S.C. § 1291, and challenges to sentences under 18 U.S.C. § 3742(a).

II.

Muhammad and Peterson argue that their right to cross-examination under the Confrontation Clause was violated when the District Court allowed FBI forensic expert, Nicole Nicklow, to testify about the results of, and procedures used to perform, certain DNA tests that matched the defendants to the robbers' apparel and masks, without her having personally performed or supervised those tests. They claim that her testimony constituted an out-of-court testimonial statement, and that they did not have a prior opportunity to cross-examine the lab technicians who actually performed the tests, but did not testify at trial.

---

[2] Peterson's lengthy sentence was a function of his career offender status.

5

Even assuming, *arguendo*, the District Court erred in admitting Nicklow's testimony, we conclude such error is harmless. An evidentiary error that runs afoul of the Confrontation Clause is harmless only if we conclude beyond a reasonable doubt that the error did not contribute to the jury's judgment of conviction. *See United States v. Lore*, 430 F.3d 190, 209 (3d Cir. 2005). Our Court "consider[s] numerous factors in assessing whether the erroneous admission of testimonial evidence in violation of the Confrontation Clause was harmless to the defendant, including the importance of the testimony to the Government's case, the cumulative nature of the evidence, the existence of corroborating evidence, the extent of cross-examination allowed in the case, and the strength of the Government's case as a whole." *United States v. Jimenez*, 513 F.3d 62, 78 (3d Cir. 2008) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

Considering all of these factors—particularly the breadth and nature of the other overwhelming and cumulative evidence that the Government offered at trial—it appears beyond a reasonable doubt that the guilty verdicts rendered on all three counts were not attributable to any constraint on Muhammad and Peterson's rights to confrontation that may have resulted from Nicklow's testimony. The Government's case-in-chief rendered any evidence concerning DNA testing cumulative, if not superfluous.[3] The Government's case against Muhammad and Peterson was formidable. The evidentiary

---

[3] Although the Government frequently referenced the DNA evidence during its closing statement, it also commented that the DNA evidence was a "throw-in." JA745:25. The Government further discussed evidence, including documents and physical evidence, which demonstrated that the suspects were wearing the same articles of clothing, such as gloves, shoes, and pants, both at the bank and the time of their apprehension, noting that this "evidence is almost stronger than the DNA evidence." JA748:1-19; *see also* JA749:24 to JA750:16.

6

record connecting Muhammad and Peterson to the crimes was overwhelming and convincing, particularly including the testimony of numerous witnesses who were present at virtually every stage of the robbery, chase, and apprehension, as well as bank surveillance footage in which the robbers could be seen wearing apparel that was confiscated from the defendants at the time of their arrest, and a wide array of physical evidence recovered from the getaway vehicles and the defendants themselves, including the stolen cash and security guard's gun, as well as the perpetrators' own weapons, apparel, and masks. Accordingly, to the extent that allowing Nicklow's testimony constituted error, it was harmless.

## III.

Muhammad and Peterson challenge several of the District Court's evidentiary rulings, which we address *seriatim*. Unless a decision was based upon an interpretation of the Federal Rules of Evidence, we review district court rulings on the admissibility of evidence for abuse of discretion. *See United States v. Serafini*, 233 F.3d 758, 768 n.14 (3d Cir. 2000) (citing *United States v. Pelullo*, 964 F.2d 193, 199 (3d Cir. 1992)). "An abuse of discretion occurs only where the district court's decision is 'arbitrary, fanciful, or clearly unreasonable'—in short, where 'no reasonable person would adopt the district court's view.'" *United States v. Green*, 617 F.3d 233, 239 (3d Cir. 2010) (quoting *United States v. Starnes*, 583 F.3d 196, 214 (3d Cir. 2009)).

Even if an evidentiary ruling constitutes error, the harmless error analysis applies: "A non-constitutional error at trial does not warrant reversal where 'it is highly probable that the error did not contribute to the judgment.'" *United States v. Stadtmauer*, 620 F.3d

7

238, 265-266 (3d Cir. 2010) (quoting *United States v. Helbling*, 209 F.3d 226, 241 (3d

Cir. 2000)).

However, if a defendant failed to properly preserve an objection at trial, we review

for "plain error that affects substantial rights." *See* Fed. R. Crim. P. 52(b). Under this

standard of review, error is reversible under limited circumstances:

> [A]n appellate court may, in its discretion, correct an error not raised at trial
> only where the appellant demonstrates that (1) there is an "error"; (2) the
> error is "clear or obvious, rather than subject to reasonable dispute"; (3) the
> error "affected the appellant's substantial rights, which in the ordinary case
> means" it "affected the outcome of the district court proceedings"; and (4)
> "the error seriously affect[s] the fairness, integrity or public reputation of
> judicial proceedings."

*United States v. Marcus*, 130 S. Ct. 2159, 2164 (2010) (quoting *Puckett v. United States*,

556 U.S. 129, 135 (2009)).

A.

Muhammad claims that the District Court abused its discretion by admitting as

business records two bank teller reports showing the losses from the bank tellers' cash

drawers, because the witness was not "qualified" and could not lay sufficient foundation

for the reports under Fed. R. Evid. 803(6). We conclude this argument is without merit.[4]

Rule 803(6) creates a hearsay exception for the admission of business records if

"the testimony of the custodian or another qualified witness" shows: (1) "the record was

made at or near the time by—or from information transmitted by—someone with

knowledge"; (2) "the record was kept in the course of a regularly conducted activity of a

---

[4] Peterson joins this argument on appeal without having raised any objection before the
District Court. For the same reasons we find no abuse of discretion as to Muhammad, we
find no plain error as to Peterson.

business"; and (3) "making the record was a regular practice of that activity." Fed. R. Evid. 803(6). Our Court broadly interprets the term, "qualified witness"; to be qualified, a witness only needs to "have familiarity with the record-keeping system" or "understand[] the system." *United States v. Console*, 13 F.3d 641, 657 (3d Cir. 1993); *see also United States v. Furst*, 886 F.2d 558, 572 n.18 (3d Cir. 1989) (recognizing that "the issue is whether the witness, whether inside[] or outside [the business], has sufficient personal knowledge from which to testify to the elements required to establish the foundation").

Here, the foundational requirements of Rule 803(6) were met. The witness, Colby Miller, demonstrated sufficient familiarity and understanding of the bank's record keeping system to establish he was a qualified witness, and his testimony set forth the necessary showing for a business record under the Rule. As the Bank of America Corporate Security Protective Services Manager, Miller was responsible for the bank's security program and equipment, as well as assisting law enforcement's investigation of robberies. To assist such investigations, Miller would collect security surveillance videotape and images of the robbery, and written witness statements, as well as interview bank security officers present at the time of the robbery. Miller would also collect bank teller loss reports from either the bank manager or assistant manager. These reports were obtained from a computer system known as the Merlin Bank System. As Miller testified, the Merlin system would record information about the activity at a teller's station during the normal course of the bank's business based upon tellers counting down cash in their drawers and then reporting the amount counted to the system; the system would then

9

calculate any difference between the amounts each drawer should have and the amount a teller reported.[5] As a matter of routine practice, the bank would perform the same countdown procedure and Merlin system calculation following a robbery incident. Miller testified that he collected two such loss reports prepared the evening of the March 12, 2009 robbery based upon two teller drawers from which the robbers obtained cash.

Such testimony was sufficient to demonstrate Rule 803(6)'s foundational requirements. Accordingly, we conclude the District Court did not abuse its discretion by admitting the two loss reports as business records.

B.

Muhammad's next evidentiary argument concerns the admissibility of Miller's testimony describing what he saw depicted in still images obtained from the bank's security surveillance video. He contends that the District Court abused its discretion by admitting this testimony as lay witness testimony under Fed. R. Evid. 701. For admission of such testimony to be proper under the Rule, the witness's opinions or inferences must be: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Muhammad argues the prerequisites under subsections (a) and (b) were not met

---

[5] After the two loss reports were admitted into the record over defense counsel's objection, Miller further clarified that tellers would count down cash in their drawers randomly throughout a given day and that the amount counted would be compared to the amount of cash with which the teller started initially.

10

since Miller was not an eyewitness to the bank robbery and the testimony was not helpful to the determination of a fact in issue. We disagree.[6]

First, contrary to Muhammad's contention otherwise, Miller's testimony was based upon his personal knowledge, and specifically what he saw in the surveillance videotape and image stills derived from that footage. His prior review of the surveillance videotape for the purpose of reporting details of the robbery to the bank's corporate security, and his familiarity with the bank's premises and employees, made him eligible under Fed. R. Evid. 701(a) to testify about what was depicted in the video and footage stills. *Cf. United States v. Leo*, 941 F.2d 181, 193 (3d Cir. 1991) (concluding that testimony was rationally based on a witness's review of business records pursuant to an audit investigation).

Second, Miller's testimony was helpful in allowing the jury to understand the security footage in terms of the angles in which the security cameras were oriented in the bank, what features of the bank were depicted, and identifying a bank employee. His testimony about the images also was helpful to understanding whether the subject matter of a particular image was moving or still, and pointing out other specific details present in the images that might not be apparent to a jury upon a single viewing. *Cf. United States v. Begay*, 42 F.3d 486, 503 (9th Cir. 1994) ("[I]t is reasonable to assume that one viewing

---

[6] Peterson joins Muhammad's argument on appeal without having preserved this issue before the District Court. As we find no abuse of discretion as to Muhammad, we similarly find no plain error as to Peterson.

11

a videotape of a demonstration involving over 200 people would likely not see certain details, given the tremendous array of events all occurring simultaneously.").[7]

Moreover, Muhammad and Peterson had the ability to test any weaknesses in Miller's testimony concerning the surveillance videotape and images through cross-examination. *See* Fed. R. Evid. 701 advisory committee's note (recognizing that Fed. R. Evid. 701(b) presumes that "cross-examination and argument will point up the weakness" in lay witness testimony); *see also Gov't of V.I. v. Knight*, 989 F.2d 619, 630 (3d Cir. 1993) (recognizing same). They chose not to do this, however. Peterson did not cross-examine Miller, and Muhammad's cross-examination of Miller exclusively involved questions about the Merlin system.

Additionally, Miller's testimony was not an attempt "to introduce meaningless assertions which amount to little more than choosing up sides" and thus warrants "exclusion for lack of helpfulness." Fed. R. Evid. 701 advisory committee's note. He did not express opinions about any of the ultimate issues to be decided by the jury. *Cf. Hirst v. Inverness Hotel Corp.*, 544 F.3d 221, 226-27 (3d Cir. 2008) (concluding testimony was not helpful under Fed. R. Evid. 701(b) because it went to the "ultimate issue of causation").

---

[7] Additionally, Muhammad's counsel objected to Miller's testimony on grounds that it intimated that the image quality may not have been "clear." *See* JA60:16-18 ("And I find that Mr. Miller's gloss on this, 'oh, he's holding a gun, it has a barrel,' may not be so clear to the jury if they take a look at the picture . . . ."). Insofar that image quality might have been poor, Miller's testimony would have helped the jury efficiently discern what the images depicted in light of his prior viewing of the video footage.

12

In sum, we cannot conclude the District Court abused its discretion in admitting Miller's surveillance videotape and image testimony as a lay opinion.[8]

C.

Muhammad and Peterson raise another lay opinion challenge to the testimony of Jennifer Walsh concerning the two GPS tracking devices hidden in the stolen money and the tracking data emitted from the devices during the robbery. The District Court erred, they claim, by admitting the testimony under Fed. R. Evid. 701 when it could not meet any of the Rule's three prerequisites primarily because Walsh was unable to explain certain aspects of the tracking system's specific performance and accuracy during the robbery, and had no scientific background concerning the functionality of the GPS device. Additionally, Muhammad and Peterson claim that Government Exhibits 1008A and B, 1009A, B, and C, which were the spreadsheet data and tracking maps derived from the data emitted from the tracking devices, lacked foundation.

Even if we assume, *arguendo*, that these rulings were in error, they were harmless. Given the aforementioned overwhelming and convincing evidence that the Government introduced at trial, it is highly probable that any such error did not contribute to the judgment. The Government produced at trial eyewitnesses, including an eyewitness who

---

[8]  To the extent that certain aspects of Miller's testimony could be deemed to be lacking in helpfulness under Fed. R. Evid. 701(b) by drawing inferences or conclusions that the jury was equally capable of drawing, such as, by way of example, the color of an individual's shoes or bag, Muhammad and Peterson make no specific contention as to how such inferences or conclusions could have adversely affected the jury's verdict. Moreover, given the overwhelming and cumulative evidence that the Government offered at trial, as previously discussed, we conclude that to the extent there was any error in admitting Miller's testimony, it is highly probable that such error did not contribute to the verdict, and thus was harmless.

13

saw the robbers' jeep pull out of the bank's parking lot and the officer who chased the robbers' van, who testified as to the movements and location of the robbers' vehicles from the time they left the bank's premises to the time they were apprehended—effectively the same facts which the spreadsheets and maps showed. Much like the DNA evidence that the Government introduced, the GPS tracking data and Walsh's testimony about the data were clearly cumulative.[9] Furthermore, Muhammad and Peterson have raised no argument that the error was prejudicial. Thus, if indeed any error did occur, it was not reversible error.

## D.

Muhammad and Peterson argue that the District Court erred by allowing victims of the robbery—specifically, two bank tellers, Best Fumador and Parandeep Singh, and the security guard, Alejandro Ambrose—to testify about their states of mind during the robbery and the impact that the robbery subsequently had on their lives. According to the Defendants, such impact testimony was irrelevant and unduly prejudicial under Fed. R. Evid. 401 and 403.

Because only Peterson objected on relevance grounds to Fumador's testimony concerning the effect the robbery subsequently had on his life, we review that challenge for abuse of discretion. We review the other assignments of error, which were not preserved at trial by defense objection, for "plain error that affects substantial rights."

---

[9] Indeed, the Government acknowledged during its closing argument that the physical evidence recovered from Muhammad at the time of his arrest was "almost better than the GPS evidence" in connecting him to the robbery. JA748:18.

14

We conclude that the District Court did not abuse its discretion by overruling Peterson's relevance objection to Fumador's testimony. How the robbery impacted Fumador was at least minimally probative of whether the Defendants took something of value "by force and violence, or by intimidation," one of the elements of bank robbery under 18 U.S.C. § 2113(a). Under Section 2113(a), "intimidation" means "to make fearful or put into fear," and requires an objective focus on whether "'an ordinary person in the teller's position would feel a threat of bodily harm from the perpetrator's acts.'" *United States v. Askari*, 140 F.3d 536, 541 (3d Cir. 1998) (en banc) (quoting *United States v. McCarty*, 36 F.3d 1349, 1357 (5th Cir. 1994)), *vacated on other grounds by* 159 F.3d 774 (3d Cir. 1998) (en banc). Although the inquiry concerns whether a defendant's conduct was objectively intimidating, evidence concerning how a victim was impacted by the defendant's acts after they were committed would nonetheless be within the realm of evidence that could be relevant to prove the defendants' intimidation. Such evidence would have the tendency to make the fact of objective intimidation more or less probable than it would be in the absence of such evidence. *See* Fed. R. Evid. 401; *cf. United States v. Smith*, 973 F.2d 603, 604 (8th Cir. 1992) ("Evidence that the defendant's acts did induce fear in an individual victim is probative of whether his acts were objectively intimidating.") (citing *United States v. Higdon*, 832 F.2d 312, 315 (5th Cir. 1987)). As such, the District Court acted well within its sound discretion in permitting Fumador's testimony as relevant.[10]

---

[10] Muhammad joined Peterson in this argument even though he did not raise any objection to this evidence at trial. For the same reasons that we conclude the District

15

Similarly, it was not plain error on the basis of Fed. R. Evid. 403 to admit the other victims' impact testimony as it pertained to themselves personally, or their observations about the reactions of the bank's customer. Those victims' testimony was probative of whether the Defendants were objectively intimidating, and thus admission on the grounds of relevance was not erroneous, let alone constitute a clear or obvious error. We also do not find plain error on grounds of undue prejudice because the testimony does not appear to have the tendency to lead the jury "into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997); *see also United States v. Gatto*, 995 F.2d 449, 457 (3d Cir. 1993) ("[W]hen a trial court is not given the opportunity to exercise its discretion in striking the [requisite Rule 403] balance, we will seldom find plain error . . . .").

E.

At trial, three police officers each testified that they heard reports over the police dispatch radio that the robbery suspects were armed and that a weapon was discharged during the pursuit of the robbery suspects. Muhammad and Peterson claim that the admission of this repeated testimony was error because it was, first, inadmissible hearsay under *United States v. Sallins*, 993 F.2d 344 (3d Cir. 1993), and, second, unduly prejudicial and cumulative under Fed. R. Civ. Evid. 403. We disagree.

Court did not abuse its discretion in permitting this testimony as relevant, we conclude there was no plain error with respect to Muhammad.

16

The radio dispatch statements did not constitute hearsay under the law of our Circuit.[11] The statements were not offered for their truth but rather offered for the purpose of explaining the context of the officers' actions in responding to the scene and apprehending the suspects. *See Price*, 458 F.3d at 210 (holding that "[p]olice officers are permitted under *Sallins* to explain the background context for their arrival at a scene"). Detective Steven Dunkel explained he did not follow the suspects' van closely due to a dispatch that reported that the suspects likely were armed. Officer Adam Ramirez explained that because of the dispatch reports he heard, he sought immediate cover behind a police car upon arriving near the suspects' parked van. Officer Michael Coppola explained that upon hearing the dispatch reports he and his partner retrieved weapons from their lock boxes at police headquarters and, after exiting his vehicle at the scene, he drew his weapon. Additionally, Detective Dunkel's testimony at trial about the very radio dispatch he made, communicating that the suspects had fired a weapon during his pursuit, further demonstrates that the other two officers' testimony was background. *See id.* at 211 (recognizing that *Sallins* does not apply when the officer who actually issued the radio dispatch testifies because it demonstrates that the background testimony was not serving as "illegitimate backdoor eyewitness testimony"). Accordingly, the three officers' testimonies were not hearsay.

Additionally, the testimonies were not unduly prejudicial or cumulative. The three officers' testimonies do not appear to be of such a nature that they were likely to incite

---

[11] Whether a statement constitutes hearsay is a legal question subject to plenary review. *See United States v. Price*, 458 F.3d 202, 205 (3d Cir. 2006).

17

the jury to render an irrational decision. *See Old Chief*, 519 U.S. at 180. Beyond labeling the testimonies as "inflammatory," Muhammad and Peterson have advanced no specific explanation as to how the jury might be unfairly influenced based upon such evidence, and thus it is unclear to us where any undue prejudice might lie. *Cf. McQueeney v. Wilmington Trust Co.*, 779 F.2d 916, 923 (3d Cir. 1985) ("The court did not articulate any reasons for its finding of prejudice, and this does not appear to us to be the kind of evidence with obvious or overwhelming potential for unfair prejudice. In the absence of a showing of particularized danger of unfair prejudice, the evidence must be admitted."). Reversal of a ruling under Rule 403 is warranted only if the district court's analysis and ruling was "arbitrary or irrational," or if no reasonable person would adopt the district court's view. *See United States v. Universal Rehab. Servs. (PA), Inc.*, 205 F.3d 657, 665 (3d Cir. 2000) (en banc); *Green*, 617 F.3d at 239. Because no reasonable person could agree here that the prejudicial effect of the evidence, if any, outweighed its probative value, we determine that the District Court did not abuse its discretion by failing to exclude the three officers' testimonies as unduly prejudicial.

Finally, the testimony concerning the police dispatches was brief in the context of the witnesses' individual testimonies, and the overall trial; any contribution of the testimonies to the length of trial was minimal. It would not be arbitrary or irrational to reason that any "contribution to the length of trial" was outweighed by the "contribution to the determination of truth" concerning the context of the officers' conduct. *See United States v. Cross*, 308 F.3d 308, 326 (3d Cir. 2002) (quoting *United States v. Williams*, 81 F.3d 1434, 1443 (7th Cir. 1996)).

Accordingly, the District Court did not abuse its discretion in allowing the three witnesses to testify about the radio dispatches they heard concerning the discharge of firearms during the suspects' flight from the bank.

F.

In another evidentiary challenge concerning an audio recording of Detective Dunkel's police radio dispatch report, Muhammad and Peterson argue that the recording, in which Detective Dunkel exclaims, "Shots fired! Shots fired!," was improperly admitted. The recording, they claim, was irrelevant, unduly prejudicial, and cumulative.[12] We conclude that no abuse of discretion occurred by admitting the recording into evidence.

Our Court has "consistently treated escape as part and parcel of a bank robbery, including federal bank robbery as defined in 18 U.S.C. § 2113" and recognized that acts incidental to an escape, such as weapon discharges, are "'within the scope of the federal Bank Robbery Act, 18 U.S.C. § 2113(d),' and thus within § 2113(a) as well." *United States v. Williams*, 344 F.3d 365, 372 (3d Cir. 2003) (quoting *Gov't of V.I. v. Dowling*, 633 F.2d 660, 668-69 (3d Cir. 1980)). Thus, evidence showing that the suspects discharged a firearm during the chase, as the recording demonstrates, was probative of the offenses charged. Furthermore, the probative value of the recording outweighs any undue prejudice that Detective Dunkel's excited tone, as heard in the recording, may have prompted. Additionally, the recording was not cumulative since its "contribution to

---

[12] The parties agree that the audio recording falls under the hearsay exceptions of Fed. R. Evid. 803 and would not be excluded by the rule against hearsay.

the length of trial" did not outweigh its "contribution to the determination of truth" for which it was offered. *See Cross*, 308 F.3d at 326. In sum, the admission of the recording did not contravene Fed. R. Evid. 401, 402, and 403, and thus there was no abuse of discretion.

G.

Muhammad also claims the admission of an audio recording of Officer Ramirez's police radio dispatches for the purpose of rebutting the defense's impeachment of Officer Ramirez's credibility was in error in two respects.[13] Because neither of these claims of error were preserved before the District Court, we apply plain error review and conclude both of Muhammad's arguments are without merit.[14]

First, Muhammad argues that Officer Ramirez's dispatch statement reporting that three or four males exited the van at St. Peter's University Hospital was improperly admitted as a prior consistent statement under Fed. R. Evid. 801(d)(1)(B). He claims that the statement did not satisfy one of the four prerequisites for admissibility under the Rule, which requires that "the proponent must offer a prior consistent statement that is consistent with the declarant's challenged in-court testimony." *United States v. Frazier*, 469 F.3d 85, 88 (3d Cir. 2006). We disagree.

On direct examination, Officer Ramirez stated he had seen four individuals exit the van. Muhammad's cross-examination suggested that Officer Ramirez had fabricated

---

[13] Peterson does not advance this argument on appeal.

[14] Although Muhammad objected to the admission of the recording at trial, his grounds for objecting were entirely different from his arguments of error on appeal.

this testimony and proffered a videotape deposition taken the day after the robbery. In that videotape, Officer Ramirez stated that he had seen two to three individuals exiting the van, and that it was not until the defendants were arrested that he realized four individuals were involved. In rebuttal, the Government sought to offer the dispatch recording made at the time of the chase—in which Officer Ramirez recounted his observation that three or four men exited the van. This dispatch statement is sufficiently consistent with the challenged in-court testimony for purposes of Fed. R. Evid. 801(d)(1)(B). "The purpose of Rule 801(d)(1)(B) is not to 'bolster[] the veracity of the story told,' but to rebut a charge of recent fabrication or improper influence or motive." *Frazier*, 469 F.3d at 88 (quoting *Tome v. United States*, 513 U.S. 150, 158 (1995)). It follows that the rule allows the "use of earlier statements that are g*enerally consistent* with the testimony at trial." *United States v. Casoni*, 950 F.2d 893, 904 (3d Cir. 1991); *see also United States v. Vest*, 842 F.2d 1319, 1329 (1st Cir. 1988) ("[A] prior consistent statement need not be identical in every detail to the declarant's . . . testimony at trial . . . ."). Officer Ramirez's dispatch statement that he observed three to four individuals exit the van is generally consistent with his trial testimony that he saw four individuals exit the van, and thus sufficiently within the ambit of Rule 801(d)(1)(B). The District Court thus did not commit error, let alone clear or obvious error, in admitting Officer's Ramirez's prior statement under Rule 801(d)(1)(B).

In his second argument against the admission of the audio of Officer Ramirez's dispatch report, Muhammad asserts undue prejudice. He claims that the Government played not only Officer Ramirez's statement concerning the number of individuals that

21

emerged from the van, but also additional statements from the same recording, including Officer Ramirez exclaiming, "shots fired," and stating that he observed a minivan with the back window shot out. Muhammad claims these additional statements were unduly prejudicial. However, in our assessment, those statements do not plainly appear to have the tendency to influence the jury to render an irrational decision. *See also Gatto*, 995 F.2d at 457. We conclude that there was no plain error in the admission of the additional statements.

IV.

Muhammad and Peterson contend that several instances of prosecutorial misconduct denied them a right to fair trial. We conclude that none of the claims of misconduct warrant a new trial.

There are four instances of purported prosecutorial misconduct at issue. The first one advanced by the Defendants arises from the Government asking Detective Dunkel on re-direct examination whether it was "[s]afe to say the defendant wasn't a very good shot?" The question was prompted by cross-examination that probed how Detective Dunkel knew a weapon was discharged at his vehicle during his pursuit of the robbery suspects when no bullet actually struck his vehicle. The Defendants claim that the Government's use of the term, "defendant," instead of the more generic terms, "suspect" or "shooter," implied, without support, that specifically Muhammad or Peterson discharged the firearm during Detective Dunkel's pursuit of the suspects' van. Muhammad and Peterson objected, but the District Court overruled it and did not give a curative instruction. However, the District Court had instructed the jury both at the

22

beginning and end of trial that the lawyers' statements, arguments, objections, and questions did not constitute evidence and that their decisions in the case could be based only on the evidence presented.[15]

Muhammad claims, as the second instance of misconduct, that the Government engaged in misconduct by inadvertently publishing to the jury two photographs of bucal swabs used to obtain DNA testing samples from Muhammad and Peterson.[16] Labels on the swabs indicated that the samples were taken at "Middlesex Jail." Upon Muhammad's objection, the Court declined to give a curative instruction for the two non-redacted photographs of the bucal swabs, reasoning that such an instruction would "actually call more attention" to the reference to "Middlesex Jail" on the swabs' labels, and neither Defendant objected. However, the District Court ordered that the photographs be redacted of that information before being presented again to the jury, and neither Muhammad nor Peterson objected.

Muhammad and Peterson also claim that the third instance of misconduct occurred when the Government inadvertently published to the jury a photograph of Muhammad wearing an orange sweater which was purportedly taken after his apprehension. Immediately following this brief publication, the District Court barred the photograph from evidence and gave the jury a curative instruction that the photograph was not in

---

[15] We note that the trial transcript does not transcribe the Court's preliminary jury instructions, instead noting parenthetically, "Court gives jury instructions." JA6:8. Nonetheless, in charging the jury at the conclusion of the trial, the Court prefaced its instructions concerning evidence and what constitutes as evidence with the comment, "As I told you in my preliminary instructions . . . ." JA681:21.

[16] Peterson does not join this argument on appeal.

23

evidence and was to be disregarded and that they could only consider documents in evidence and the witness's testimony.

Finally, Muhammad and Peterson argue that a fourth instance of misconduct arose when the Government argued during closing that certain DNA evidence demonstrated that a particular mask and certain items of clothing were worn by Muhammad during the robbery. Defendants contend this argument was unsupported because they had attacked the weight of the DNA evidence on cross-examination.

The District Court ruled on objections to the first three instances of purported misconduct, and we review those rulings for abuse of discretion. *See United States v. Brown*, 254 F.3d 454, 458 (3d Cir. 2001). However, even if prosecutorial misconduct occurred, we apply the harmless error standard and will not reverse if it is beyond a reasonable doubt that the constitutional error did not contribute to the judgment. *See United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc). Reversal is warranted only "if we conclude that the prosecutor's remarks, taken in the context of the trial as a whole, prejudiced the defendants." *Id*. If a defendant did not contemporaneously object to the purported prosecutorial misconduct, as is the case with the fourth instance of purported misconduct, we review for plain error. *See United States v. Brennan*, 326 F.3d 176, 182 (3d Cir. 2003).

Even if we were to find error for the first three instances of supposed misconduct, we conclude that the District Court was within its discretion to deny the motions for a mistrial because the supposed acts of misconduct were harmless, in light of their scope in relation to the context of the trial, the ameliorative effect of any curative instructions, as

24

well as the strength of the evidence supporting the jury's verdict. *See United States v. Gambone*, 314 F.3d 163, 179 (3d Cir. 2003); *Zehrbach*, 47 F.3d at 1265. These brief instances of purported misconduct had a negligible impact on the outcome of the trial. This is particularly so given that the District Court's various instructions ameliorated any possible prejudicial effect. Moreover, as we have discussed previously, the convincing evidence that the Government presented against Muhammad and Peterson was overwhelming and supports the convictions. We thus are assured beyond a reasonable doubt that the three incidents of purported misconduct did not contribute to Muhammad and Peterson's convictions. Accordingly, the District Court did not abuse its discretion in denying the motions for mistrial.

As to Muhammad and Peterson's claim—the fourth instance of misconduct—that the Government made closing arguments unsupported by the record, we find no plain error. The closing statements of which Defendants complain do not "reveal egregious error or a manifest miscarriage of justice." *Brennan*, 326 F.3d at 182 (internal quotations omitted). For one, their argument does not account for the fact that the prosecution connected Muhammad and Peterson to various articles of clothing and masks not only based upon DNA evidence, but also physical and documentary evidence that showed Defendants wearing certain articles of clothing while at the bank and at the time of their apprehension. Moreover, we do not find any colorable miscarriage of justice here. Thus, the Court's refusal to declare a mistrial based on the Government's statements did not constitute plain error.

25

V.

Finally, Muhammad and Peterson raise individualized sentencing claims, which we address below.

A.

Muhammad challenges the District Court's offense level calculation under the U.S. Sentencing Guidelines, contending that a two-level enhancement for reckless endangerment during flight under U.S.S.G. § 3C1.2 (2010) should not have been applied because Note 1 of U.S.S.G. § 3C1.2 and Note 4 of U.S.S.G. § 2K2.4 bar the application of that enhancement. However, neither of these double counting prohibitions applies in these circumstances.[17]

Our Court has held that "[o]nly when the Guidelines *explicitly* prohibit double counting will it be impermissible to raise a defendant's offense level under one provision when another offense Guideline already takes into account the same conduct." *United States v. Fisher*, 502 F.3d 293, 309 (3d Cir. 2007) (quoting *United States v. Wong*, 3 F.3d 667, 671 (3d Cir. 1993)) (emphasis added). Note 1 of U.S.S.G. § 3C1.2 is one such double counting prohibition. It instructs district courts not to apply U.S.S.G. § 3C1.2, a two-point enhancement for reckless endangerment during flight, under certain delineated circumstances. Those particular circumstances are when: (1) the District Court applies a Chapter 2 offense guideline, or another Chapter 3 adjustment, that "*results* in an

---

[17] Our standard of review is plenary for the District Court's interpretation of the Sentencing Guidelines, and we apply the abuse-of-discretion standard for the application of the Guidelines. *See United States v. Tupone*, 442 F.3d 145, 149 (3d Cir. 2006).

equivalent or greater increase in *offense level*," and (2) that resultant offense level is "solely on the basis of the same conduct." U.S.S.G. § 3C1.2, n.1 (emphasis added).

Here, the District Court applied the reckless endangerment enhancement for Muhammad based upon the discharge of weapons and reckless driving during flight. Muhammad contends there was no evidentiary basis to connect him to the reckless driving and as such the only factual predicate for the reckless endangerment enhancement was the discharge of weapons. Even if we accept this argument, however, the District Court still did not apply a Chapter 2 offense guideline or other Chapter 3 adjustment that *resulted* in an equivalent or greater increase in *offense level* based upon the same conduct. In determining Muhammad's offense level, the District Court applied only the base level for § 2B3.1 for Robbery, and specific offense characteristics for taking the property of a financial institution under § 2B3.1(b)(1), taking the security officer's firearm under § 2B3.1(b)(6), and taking more than $50,000 but less than $250,000 under § 2B3.1(b)(7). None of these specific offense characteristics were based on the same conduct so as to trigger Note 1 of U.S.S.G. § 3C1.2.[18]

Likewise, the District Court's application of the § 2K2.4(b) offense guideline for a 18 U.S.C. § 924(c) violation does not meet the preconditions of Note 1 of U.S.S.G. § 3C1.2. That guideline does not set forth an *offense level*, but instead provides a guideline sentence, the statutory minimum of ten years, which has no impact on an offense level calculation.

---

[18] By contrast, if the District Court had applied, for example, an offense level under § 2B3.1(b)(2)(A) for discharging a firearm during the course of robbery—which it did not—then the preconditions of Note 1 of U.S.S.G. § 3C1.2 would be met.

27

Because there was no offense guideline applied that "*results* in an equivalent or greater increase in *offense level*" based on the same conduct, Note 1 of U.S.S.G. § 3C1.2 is inapplicable in these circumstances. It follows that Note 1 does not prohibit the application of a reckless endangerment enhancement.

Muhammad also makes a double counting argument based on Note 4 of U.S.S.G. § 2K2.4, urging that Note 4 prohibits the District Court's application of the two-level enhancement for reckless endangerment during flight under U.S.S.G. § 3C1.2. We disagree. Note 4 provides that a sentencing court shall "not apply any specific offense characteristic for possession, brandishing, use, or discharge of an explosive or firearm" in connection with the sentence for the underlying offense if the defendant is also sentenced under 18 U.S.C. § 924(c). The enhancement at issue here is not a weapons enhancement, nor a specific offense characteristic pertaining to a weapon. Rather, it is a Chapter Three adjustment for recklessly endangering others in flight. Unquestionably, Muhammad's course of conduct during the police chase recklessly endangered others. The enhancement for § 3C1.2 is not limited to, or synonymous with, possession, brandishment, use, or discharge of a weapon. It is designed to increase a defendant's punishment for precisely the type of dangerous foot chase that occurred here, one that involved exchanging gunfire with police in the midst of racing through backyards and darting across driveways and a street in a residential neighborhood.[19] Because Note 4 of

---

[19]  Note 5 of U.S.S.G. §3B1.2 provides that the reckless endangerment enhancement applies if a defendant is accountable for conduct that he "induced" or "willfully caused." Muhammad thus would be accountable for the police discharging their weapons which he

U.S.S.G. § 2K2.4 only bars specific offense characteristics pertaining to weapons, or weapons enhancements, it does not bar the enhancement for reckless endangerment during flight. *See* Roger W. Haines, Jr., et al., *Federal Sentencing Guidelines Handbook: Text and Analysis* 802 (2010-11 ed.) ("[E]nhancements for factors other than guns are not improper double counting [under Note 4 of U.S.S.G. § 2K2.4]."). *Cf. United States v. Thompson*, 515 F.3d 556, 563 (6th Cir. 2008) (concluding that there was no double counting when the sentencing court imposed a sentence for § 924(c) and the "official victim" enhancement under U.S.S.G. § 3A1.2 for the defendant firing a gun at the police); *United States v. Docampo*, 573 F.3d 1091, 1099-1100 (11th Cir. 2009) (holding that Note 4 of U.S.S.G. § 2K2.4 did not prohibit the District Court from relying on the fact that the defendant possessed a firearm in determining whether to apply the "mitigating role" adjustment under U.S.S.G. § 3B1.2 when the defendant was also sentenced under § 924(c)).

In sum, we do not find the District Court abused its discretion in applying the reckless endangerment enhancement for Muhammad's offense level calculation.

B.

Peterson claims that because the District Court procedurally erred by failing to demonstrate on the record consideration of the 18 U.S.C. § 3553(a) factors, as required by 18 U.S.C.§ 3583(e), in imposing his revocation sentences for violating supervised

---

induced or willfully caused by refusing to surrender and pointing his weapon at and firing upon the police.

release, those sentences must be vacated and the matter remanded to the District Court for resentencing.  We conclude otherwise.

When, despite the opportunity, a procedural objection is not raised to the district court at the time of sentencing, as is the case here, we review the procedural reasonableness of a sentence only for plain error.  *See United States v. Parker*, 462 F.3d 273, 278 (3d Cir. 2006) (applying plain error review to an unpreserved claim of error based on the sentencing court's failure to give a sufficient statement of reasons under § 3553(c)).  However, even if we assume a clear and obvious error here, we cannot vacate Peterson's revocation sentences unless the error affects Peterson's substantial rights.  Peterson has made no showing how the outcome of his violation of sentence hearing would have been altered in the absence of such error.  In other words, he has not offered proof that there was some likelihood that the sentencing court would have imposed a lower sentence.  Indeed, Peterson did not make any challenges to his revocation sentence before the District Court, and he has not raised on appeal a substantive reasonableness challenge to the sentence.  Because there has been no showing that Peterson's substantial rights were affected, no plain error occurred.

## VI.

For the reasons set forth above, we will affirm the District Court's judgments against Muhammad and Peterson.